**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**KOPPERS COMPANY, INC.,**
**Defendant-Appellant.**

**No. 915, Docket No. 80–1362.**

United States Court of Appeals,
Second Circuit.

Argued March 31, 1981.
Decided June 29, 1981.

John Bodner, Jr., Washington, D.C. (John DeQ. Briggs, III, Robert J. Brookhiser, Howrey & Simon, Washington, D.C., Ira B. Grudberg, David L. Belt, Susan H. Bartholomew, Jacobs, Jacobs & Grudberg, P.C., New Haven, Conn., Barry J. Lipson, Pittsburgh, Pa., of counsel), for defendant-appellant.

George Edelstein, Atty., Dept. of Justice, Washington, D.C. (Sanford M. Litvack, Asst. Atty. Gen., John J. Powers, III, Atty., Dept. of Justice, Washington, D.C., Gary Kimmelman, Jacqueline W. Distelman, Stuart Grabois, Attys., Dept. of Justice, New York City, of counsel), for plaintiff-appellee.

Before FRIENDLY, MANSFIELD, Circuit Judges, and B. NEWMAN, Judge.*

MANSFIELD, Circuit Judge:

Defendant, Koppers Company, Inc. ("Koppers"), appeals from a judgment of conviction entered on August 28, 1980, by Judge Ellen Bree Burns of the United States District Court for the District of Connecticut after a jury had found Koppers guilty of a felony violation of § 1 of the Sherman Act, 15 U.S.C. § 1.[1] The indictment under which Koppers was convicted charged that "[b]eginning sometime prior to January 1970 and continuing until at least March 1975" Koppers and Dosch-King Company, Inc. ("Dosch-King"), had engaged in a conspiracy to rig bids and allocate territories in the sale of road tar to the State of Connecticut and its subdivisions. Dosch-King pleaded *nolo contendere*, cooperated with the government, and was fined $40,000; Koppers stood trial, was convicted, and was fined $400,000.[2]

We affirm. Since the jury was justified in finding that Koppers' conspiratorial conduct constituted a *per se* violation of § 1 of the Sherman Act, there was no requirement that the jury go on to find that that conduct also resulted in an unreasonable restraint of trade.

In each year of the early 1970s the State of Connecticut solicited bids on an annual

---

* Of the United States Court of International Trade, sitting by designation.

1. Title 15 U.S.C. § 1 reads as follows:
"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine

not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court."

2. Prior to December 21, 1974, violation of § 1 was a misdemeanor, 15 U.S.C. § 1 (1970); since then, it has been a felony punishable by fines of up to one million dollars. Antitrust Procedures and Penalties Act, Pub.L.No. 93–528, § 3, 88 Stat. 1706, 1708.

basis for the sale and application of road tar, a substance used to resurface and repair its secondary roads.[3] Any contracts eventually awarded for the purchase of road tar by the 169 towns and four state road maintenance districts in Connecticut had to be based on these bids. During the period covered by the indictment, Koppers and Dosch-King were the only participants in the road tar bidding. Koppers, a producer of road tar, had its plant in Kearney, N.J., and distributed its product in Connecticut from a storage facility in Portland, Connecticut, located in the eastern part of the state and owned by Mystic Bituminous Products Co. Dosch-King at all relevant times had its distribution points in Newton and New Haven, located in western Connecticut. Koppers produced all of the road tar which it sold in Connecticut. Prior to 1973 Dosch-King purchased most of its road tar from Reilly Tar and Chemical Corporation, occasionally making purchases from Koppers. Beginning in 1973, Dosch-King started buying all of its road tar from Koppers, and it continued to do so throughout the remaining period ·of the indictment. Nevertheless, Dosch-King's bids at all times reflected transportation costs measured from its facilities in the eastern part of Connecticut.

Arthur Schuck, Koppers' manager of its eastern road materials district, made a proposal to Dosch-King in 1967 that the two firms divide the state between them so that Dosch-King would be the low bidder in the western part of Connecticut, where its activities were concentrated, and Koppers would be the low bidder in the eastern part, where its storage facility and distribution point were located. To accomplish this, Koppers would communicate its plant-side price and its estimated application cost to Dosch-King prior to the bidding deadline, so that both companies could use these confidential figures as the basis for their bids. Since the two firms were based at opposite ends of the state, the use of a common base price and application cost would have the effect of making each company the low bidder in its half of the state, because of the increasing transportation costs each would incur as they bid on deliveries further and further from home. The companies would, however, continue to submit bids in all 169 Connecticut towns and all four maintenance districts, which would give the impression that they were in direct competition for the state's business even though they would know in advance which of their bids would be successful. After examining Schuck's proposal to make sure that it would in fact result in the approximately even division of the state's road tar business which Schuck had promised, Dosch-King agreed to the proposal.[4]

With minor variations not relevant here, the two parties followed the same basic pattern in making bids each year from 1968 to 1975. Each January Schuck would meet with Dosch-King officials to give them Koppers' plant-side base price and to assure them that Koppers was planning to adhere to the conspiracy. On the day before bids were due, Schuck would meet with Dosch-King personnel in Hartford. At these meetings, Schuck would give Dosch-King the bids which Koppers was going to make on the four maintenance districts, as well as the application rate which Koppers would be using in its town bids. With these figures in hand, Dosch-King was able to calculate exactly how much Koppers would be bidding in each town and maintenance district. In 1968, Dosch-King's bids were

---

3. During the period covered by the indictment, road tar was the substance which most towns preferred to use in repairing their roads, even though liquid asphalt, which could be used for the same purpose, was considerably cheaper. Since 1976, however, road tar has no longer been available in New England, because the dramatic increase in oil prices has made it more attractive for potential sellers of road tar to channel their product in other directions.

4. The companies also agreed to split up the four state maintenance districts. However, since the use of the transportation differential would not always divide the districts evenly, Schuck agreed to provide Dosch-King with Koppers' actual bid prices for the four districts, so that Dosch-King would bid high on the two eastern districts and low on the two western districts.

based on the formula worked out with Schuck. In later years Dosch-King simply calculated Koppers' bid for each town, and then adjusted its own bids so that it would win in the west and lose in the east. The result was that from 1968 through 1974 Koppers and Dosch-King succeeded in covertly dividing up the Connecticut road tar business on a roughly 50–50 basis.

In January, 1975, the companies once again submitted their bids in the normal manner but the State of Connecticut rejected them and called for a second round of bidding. When Dosch-King personnel contacted Schuck prior to the second round in order to get Koppers' base price, Schuck gave it to them, but informed them that the price would also be made available to the public. When Schuck was asked by Dosch-King whether this meant that "the deal we have had is over," he confirmed that it did. This second round of bidding, untainted by the Koppers/Dosch-King conspiracy, resulted in a notably different pattern of awards: Koppers ended up winning no awards at all, while Dosch-King's bids were somewhat lower than the ones it had submitted in January.

## DISCUSSION

■ On this appeal Koppers' principal challenge is to the charge given by Judge Burns on the question of *per se* violations of the Sherman Act:

"The Sherman Act is violated only by 'unreasonable' restraints of trade. Not all restraints of trade are unreasonable; however, certain types of conduct are regarded as unreasonable per se. This means that the mere doing of the act itself constitutes an unreasonable restraint on commerce and it is not necessary to consider why the acts were committed or what effect it had on the industry. Agreements among competitors to rig bids or allocate customers are such per se unreasonable restraints of trade and illegal.

"In this case, members of the jury, if you find beyond a reasonable doubt that the defendant was a competitor of Dosch-King Company in the submission of bids to the State of Connecticut for road tar and became party to the conspiracy charged in the indictment, then you do not have to decide whether such conspiracy was reasonable or unreasonable because as I have just explained, an agreement among competitors to allocate customers and territories and not to compete for customers by submitting collusive bids is a per se violation of the Sherman Act."

Koppers argues that this charge improperly withdrew the question of reasonableness from the jury by the use of a conclusive presumption, namely, that bid rigging and customer allocation are unreasonable *per se*. This argument asks us in effect to overrule the Supreme Court's decisions in *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), and in *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). We decline the invitation, not only because we lack the power but also because the record here reveals the wisdom and applicability to this case of the *per se* rule established in those decisions.

In *Socony-Vacuum*, which was a criminal case, the Court held that an agreement among competitors to purchase surplus gasoline on the spot market in order to check the then current rapid decline in prices violated § 1 of the Sherman Act, 15 U.S.C. § 1, which, without using the term "unreasonable," declares unlawful "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce." Although the Supreme Court had earlier interpreted this language as limited by the rule of reason, *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *American Tobacco Co. v. United States*, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911), it concluded in *Socony-Vacuum* that certain types of conduct, including price-fixing, are so patently anticompetitive that they violate the Act without proof of unreasonableness in each case and accordingly held that "[u]nder the Sherman Act a combination formed for the purpose and with the effect

of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*," 310 U.S. at 223, 60 S.Ct. at 844. The Court, applying the principle adopted by it in *United States v. Trenton Potteries Co.*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927), explained the reasoning behind the *per se* rule:

> "Ruinous competition, financial disaster, evils of price cutting and the like appear throughout our history as ostensible justifications for price-fixing. If the so-called competitive abuses were to be appraised here, the reasonableness of prices would necessarily become an issue in every price-fixing case. In that event the Sherman Act would soon be emasculated; its philosophy would be supplanted by one which is wholly alien to a system of free competition; it would not be the charter of freedom which its framers intended.

> "The reasonableness of prices has no constancy due to the dynamic quality of business facts underlying price structures. Those who fixed reasonable prices today would perpetuate unreasonable prices tomorrow, since those prices would not be subject to continuous administrative supervision and readjustment in light of changed conditions. Those who controlled the prices would control or effectively dominate the market. And those who were in that strategic position would have it in their power to destroy or drastically impair the competitive system." 310 U.S. at 221, 60 S.Ct. at 843.

Thus the Supreme Court declared what must automatically be treated as unreasonable within the meaning of its earlier judicially-created rule of reason. As Professor Bork has written:

> "Behavior is illegal *per se* when the plaintiff need prove only that it occurred in order to win his case, there being no other elements to the offense and no allowable defense." R. Bork, *The Antitrust Paradox* 18 (1978).

In *United States v. Topco Associates, Inc.*, *supra*, the *per se* rule was held applicable to allocation of market territories between horizontal competitors in order to minimize competition between them, as occurred here between Koppers and Dosch-King from 1967 to 1973. The Court stated:

> "One of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition. Such concerted action is usually termed a 'horizontal' restraint, in contradistinction to combinations of persons at different levels of the market structure, *e. g.*, manufacturers and distributors, which are termed 'vertical' restraints. This Court has reiterated time and time again that '[h]orizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition.' *White Motor Co. v. United States*, 372 U.S. 253, 263 [83 S.Ct. 696, 702, 9 L.Ed.2d 738] (1963). Such limitations are *per se* violations of the Sherman Act." 405 U.S. at 608, 92 S.Ct. at 1133.

In cases involving behavior such as bid rigging, which has been classified by courts as a *per se* violation, the Sherman Act will be read as simply saying: " 'An agreement among competitors to rig bids is illegal.' " *United States v. Brighton Building & Maintenance Co.*, 598 F.2d 1101, 1106 (7th Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979). Since the Sherman Act does not make "unreasonableness" part of the offense, it cannot be said that the judicially-created *per se* mechanism relieves the government of its duty of proving each element of a criminal offense under the Act. We note that every other circuit court which has confronted this issue has arrived at the same conclusion. *United States v. Society of Independent Gasoline Marketers*, 624 F.2d 461 (4th Cir. 1980), *cert. denied*, 449 U.S. 1078, 101 S.Ct. 859, 66 L.Ed.2d 801 (1981); *United States v. Continental Group, Inc.*, 603 F.2d 444 (3d Cir. 1979), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980); *United States v. Gillen*, 599 F.2d 541 (3d Cir.), *cert. denied*, 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979); *United States v. Brighton Building & Maintenance Co., supra*.

Notwithstanding this settled law, which is rationally based and consistent with the language of the Act, Koppers argues that other Supreme Court decisions, *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), have in effect put an end to criminal prosecutions for *per se* violations.[5] We disagree.

The decisions relied upon by Koppers are clearly distinguishable from *Socony-Vacuum* and the present case. *United States v. United States Gypsum Co., supra,* grew out of an indictment charging six major manufacturers of gypsum board with fixing prices by exchanging price information in violation of the Sherman Act. The defendants argued that their actions were undertaken for the purpose of complying with the "meeting competition" provision of the Robinson-Patman Act. 15 U.S.C. § 13. The jury was not required by the district court to find that the defendants intended to fix prices. The jury was simply instructed that it could convict the defendants if it found that " 'the *effect* of the exchanges of pricing information [had been] to raise, fix, maintain, and stabilize prices.' " *Id.* 430 U.S. at 430, 98 S.Ct. at 2869 (emphasis supplied). The Supreme Court held that the instruction was erroneous, because it did not require the jury to find that the defendants, in exchanging the pricing information, had intended to fix prices. In reaching its decision, the Court was careful to note that proof of intent was necessary because the conduct in cases like *Gypsum* was "often difficult to distinguish from the gray zone of socially acceptable and economically justifiable business conduct" which the Court did not want to inhibit unduly. *Id.* at 441, 98 S.Ct. at 2875. The

Court contrasted the conduct in *Gypsum* with "conduct regarded as *per se* illegal because of its unquestionably anticompetitive effects, see, *e. g., United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 [60 S.Ct. 811, 84 L.Ed. 1129] (1940)." *Id.* at 440, 98 S.Ct. at 2875. Thus the Court clearly indicated that if the jury had properly been instructed that to convict it must find an intent to fix prices the conviction would have been upheld without proof that the prices were unreasonable. Here Judge Burns did properly instruct the jury in unequivocal terms that an essential element of the crime was a conscious agreement between the defendants to submit collusive, rigged bids to Connecticut towns for sale and application of road tar, which meant that they must be found to have acted "voluntarily and intentionally." The evidence was undisputed that the defendants conspired to bid according to agreed-upon prices.

For the same reasons appellant's reliance on *Morissette v. United States, supra* (holding that intent is an essential element of the crime of embezzlement, 18 U.S.C. § 641, which must be charged to the jury) and *Sandstrom v. Montana, supra* (declaring erroneous, where intent was an essential element, an instruction that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts") is misplaced. Here the jury was properly instructed that to convict it must find an intent to rig prices. Since an agreement to fix prices is by its very nature a restraint on competition within the meaning of § 1 of the Sherman Act and lacks "any redeeming virtue," *Northern Pacific Railway v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), there was no need for the government to prove that the prices fixed were unreasonable.[6] The government

5. Koppers has made it clear, both in its briefs and at oral argument, that its argument is in now way meant to contest the validity of the *per se* rule in *civil* actions brought under the Sherman Act.

6. Koppers also argues that the district court's charge on intent, which permitted the jury to

convict if it found that the defendant had known the objective of the conspiracy to rig bids and had intentionally become a member of it, was in conflict with *Gypsum*, because it did not require the jury to find that Koppers had also intended that the conspiracy result in anticompetitive effects. We reject this contention for the same reason that we reject Koppers'

proved every fact necessary to constitute the crime alleged. *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Since we are persuaded that the behavior found to exist in this case fell into the *per se* category, we conclude that the district court did not err in not requiring the jury, once an agreement to rig prices was established, to find that the restraint on trade caused by the Koppers/Dosch-King conspiracy was unreasonable.

■ In addition to arguing that the charge given by the district court improperly withdrew the issue of reasonableness from the jury by the use of a conclusive presumption, Koppers also contends that the charge denied the jury the opportunity to find that the conspiracy in which Koppers was involved was not a horizontal conspiracy to rig bids or allocate customers but was instead a vertical allocation of territories or customers, which would properly be subject to the rule of reason. In making this argument, Koppers points to the fact that by 1973 Dosch-King was buying all of its road tar from Koppers, and that therefore their relationship was a vertical one, similar to the manufacturer-distributor relationship found to be subject to the rule of reason in *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

The issue posed in the *Continental T.V.* case was whether a manufacturer's policy of limiting the number of franchises granted and requiring each franchisee to sell its products only from the location at which it was franchised constituted a *per se* violation of the Sherman Act. After noting that vertical restrictions of this type can often be expected to increase both intrabrand and interbrand competition, the Court concluded that a blanket *per se* rule applicable to all

vertical restraints should not be laid down, because such restraints have not been shown to have the consistently "pernicious effect on competition" which previous decisions of the Court have required as a predicate for the imposition of a *per se* rule. *Id.* at 58, 97 S.Ct. at 2561. See *Northern Pacific Railway v. United States, supra*. The Court then went on to deal with the problems which may arise in classifying cases as vertical or horizontal in nature:

"There may be occasional problems in differentiating vertical restrictions from horizontal restrictions originating in agreements among the retailers. There is no doubt that restrictions in the latter category would be illegal *per se*, see, e. g., *United States v. General Motors Corp.*, 384 U.S. 127 [86 S.Ct. 1321, 16 L.Ed.2d 415] (1966); *United States v. Topco Associates, Inc., supra*, but we do not regard the problems of proof as sufficiently great to justify a *per se* rule." 433 U.S. at 58 n.28, 97 S.Ct. at 2561 n.28.

There was no foundation in the evidence in this case to support Koppers' theory that its behavior was the sort that *Continental T.V.* sought to protect. The district court did not, therefore, err in refusing to give the requested charge based on *Continental T.V.* The decision in *Continental T.V.* not to impose a *per se* rule was based on the Court's determination that the kind of vertical restraint under consideration there held out at least some possibility of increased competition, both intraband and interbrand. No such possibility exists here. Koppers' obvious and only motive for maintaining Dosch-King as a supplier and bidder in Connecticut was not to promote competition but to raise prices and deceive state and local officials into the belief that Kop-

---

argument against the use of the *per se* rule in criminal cases. By allowing the jury to find criminal intent without addressing the issue of intent to unreasonably restrain trade, the district court was merely being consistent in its application of the *per se* rule to this case. Since the *per se* rule makes certain conspiracies illegal without regard to their actual effects on trade, it would be illogical to refuse to allow a jury to consider whether the defend-

ant's acts had resulted in an unreasonable restraint, on the one hand, and then require it to find the specific intent to produce those effects, on the other. Where *per se* conduct is found, a finding of intent to conspire to commit the offense is sufficient; a requirement that intent go further and envision actual anti-competitive results would reopen the very questions of reasonableness which the *per se* rule is designed to avoid.

pers and Dosch-King were bona fide competitors when in fact, as the evidence conclusively showed, they were not. The sole purpose of the allocation was to enable Koppers and Dosch-King to fix higher prices while maintaining the pretense of price-based competition. For a relationship to qualify for rule-of-reason treatment under *Continental T.V.*, it is not enough that it be shown to be vertical; there must also be some "redeeming virtue," some possibility that the terms of the relationship hold out the prospect for being pro-competitive. Since the scheme entered into by Koppers and Dosch-King could not have had any effect except an anti-competitive one, *Northern Pacific Railway v. United States, supra*, 356 U.S. at 5, 78 S.Ct. at 518, the rule laid down in *Continental T.V.* is not applicable.

The historical development of the relationship between Koppers and Dosch-King lends further support to the conclusion that a *per se* approach was properly applied below. The basic bid rigging agreement between Koppers and Dosch-King arrived at in late 1967 and early 1968 was clearly unlawful as a *per se* violation, since at that time the two firms were indisputably horizontal competitors. *United States v. Socony-Vacuum, supra; United States v. Topco Associates, Inc., supra*. The terms of the agreement and the strategy for its implementation remained essentially unchanged from 1968 until the conspiracy's dissolution in 1975. While it is true that in 1973 Dosch-King began buying all of its road tar from Koppers, there is no evidence whatsoever that this change in supply patterns had any effect on the basic non-competitive relationship between the companies. The theme of *Continental T.V.* is that economic realities, including the possibility of pro-competitive activities, rather than legal formalisms should control. 433 U.S. at 46–47, 97 S.Ct. at 2555–2556. In this case, in light of the total absence of evidence that any material aspect of the Koppers/Dosch-King anti-competitive relationship was altered when Dosch-King became a purchaser of Koppers road tar, one must conclude that this technical change in the two companies'

relationship had no legal significance in antitrust terms. As the Supreme Court pointed out in *Continental T.V.*, there is no doubt that "horizontal restrictions *originating in agreements among . . . retailers . . .* would be illegal *per se*." 433 U.S. at 58 n.28, 97 S.Ct. at 2561 n.28 (emphasis supplied). Since the conspiracy between Koppers and Dosch-King to rig bids originated as an agreement among competing retailers and was not automatically transformed into something different at the moment when its vertical elements, which always existed to some degree, became more prominent, we are convinced that it should be treated throughout as a *per se* violation of the Sherman Act. It is true that on two occasions during its charge the district court gave instructions to the effect that "[w]hat the Government must prove beyond a reasonable doubt is that the defendant knowingly entered into an agreement to rig bids *or* allocate customers or territories" (emphasis supplied). While in our view it would have been more nearly in the spirit of *Continental T.V.* to have made the charge in the conjunctive rather than the disjunctive, we do not consider this lapse to be material. In the first place, the district court went on to conclude its charge on the *per se* rule by making the following summary:

"In this case, members of the jury, if you find beyond a reasonable doubt that the defendant was a competitor of Dosch-King Company in the submission of bids to the State of Connecticut for road tar and became party to the conspiracy charged in the indictment, then you do not have to decide whether such conspiracy was reasonable or unreasonable because as I have just explained, an agreement among competitors to allocate customers and territories *and* not to compete for customers by submitting collusive bids is a per se violation of the Sherman Act." (Emphasis supplied).

Thus, any confusion in the minds of the jury caused by the court's prior use of the disjunctive was cured. But even if it was not, the court's use of the disjunctive did

not amount to reversible error in the context of this case. We are not here dealing with a case where Koppers' "allocation" of customers in the western part of the state to Dosch-King was a practice that could be treated as separate and apart from the conspiracy to fix prices by rigging bids and thus possibly found to be not unreasonable within the purview of *Continental T.V.* Here, if the evidence with respect to the bid rigging and customer allocation practices on the part of Koppers and Dosch-King was accepted by the jury as credible, as surely appears to have been the case, the two practices were inextricably intertwined. The court's instruction could not, therefore, have resulted in a conviction based on customer allocation *simpliciter.*

■ Koppers' remaining assignments of error may be disposed of more briefly. We find no merit in its claim that the district court supplied the jury with the wrong standard for deciding when a company can be held criminally liable for the acts of its employees. The court charged that a corporation could be held criminally liable for the acts of its managerial agents

> "done on behalf of and to the benefit of the corporation and directly related to the performance of the duties the employee has authority to perform.... By a managerial agent I mean an officer of the corporation or an agent of the corporation having duties of such responsibility that his conduct may fairly be assumed to represent the corporation."

Koppers would have us find that liability can only be extended to the action of "*high* managerial agents," meaning those "having duties of such responsibility that [their] conduct may fairly be assumed to represent *the policy of* the corporation" (emphasis supplied).

■ We decline the invitation. The standard for imputation of liability given by the court below is amply supported. See, e. g., *Hydrolevel Corp. v. American Society of Mechanical Engineers, Inc.,* 635 F.2d 118, 127 (2d Cir. 1980), *cert. granted,* —— U.S. ——, 101 S.Ct. 3078, 68 L.Ed.2d 951 (1981); *United States v. Hilton Hotels Corp.,* 467 F.2d 1000, 1004–07 (9th Cir. 1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct.

938, 35 L.Ed.2d 256 (1973); *United States v. American Radiator & Standard Sanitary Corp.,* 433 F.2d 174, 204–05 (3d Cir. 1970), *cert. denied,* 401 U.S. 948, 91 S.Ct. 929, 28 L.Ed.2d 231 (1971). Nothing in the Supreme Court's decision in the *Gypsum* case altered this standard. Nor does the Model Penal Code support Koppers' positions. In fact, on all issues relevant to this case the Code's suggested standard of imputed liability in antitrust cases is precisely the one followed by the district court. See Model Penal Code § 2.07(1)(a) (1962); *Developments in the Law—Corporate Crime,* 92 Harv.L.Rev. 1227, 1251–52 (1979). Finally, Koppers' assertion that in the area of punitive damages a stricter standard for imputation prevails is irrelevant. To recover punitive damages, a plaintiff must demonstrate that "the defendant has acted wantonly, or oppressively, or with ... malice...." *Lake Shore and Michigan Southern Railway v. Prentice,* 147 U.S. 101, 107, 13 S.Ct. 261, 263, 37 L.Ed. 97 (1893). By contrast, even after *Gypsum* the intent element of a criminal antitrust violation does not include any finding of malice; nothing more is required than a showing that the defendant intentionally engaged in conduct that is a *per se* violation of the Sherman Act, which was proven here.

■ We also find no merit in the two evidentiary errors assigned by Koppers. The trial court's decision to admit evidence documenting the demise of the conspiracy between Koppers and Dosch-King and the subsequent change in bidding patterns was correct, since post-conspiracy evidence is admissible if it is probative of the existence of the conspiracy. *Anderson v. United States,* 417 U.S. 211, 221, 94 S.Ct. 2253, 2261, 41 L.Ed.2d 20 (1974); *United States v. Tramunti,* 513 F.2d 1087, 1115–16 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975). In determining whether or not a conspiracy ever existed, the jury was entitled to hear testimony from one conspirator that he had been told by another conspirator that "the deal we have had is over"; the same is true of evidence showing that the bidding pattern for road tar in the first post-conspiracy competition differed significantly from the patterns observed during

the life of the conspiracy. This evidence went directly to the question of whether or not a conspiracy ever existed; it therefore does not fall within the rubric of "subsequent remedial measures," Fed.R.Evid. 407, as urged by Koppers.

We also reject Koppers' argument that it was error for the district court to have permitted any reference to an investigation into road tar bid procedures undertaken in early 1975 by the State of Connecticut. The government's brief references to the report were made only to reveal to the jury the fact that the government's principal witnesses had perjured themselves during the early phases of the state investigation. In eliciting this testimony on direct, the government was acting within its right to anticipate attempts by defense counsel to attack its witnesses' credibility. See, *e. g., United States v. Hasenstab*, 575 F.2d 1035, 1040 (2d Cir.), *cert. denied*, 439 U.S. 827, 99 S.Ct. 100, 58 L.Ed.2d 120 (1978). In any case, it was defense counsel, not the prosecution, which dwelt at length on the existence of the state investigation. Under these circumstances, we are convinced no error occurred.

The conviction is affirmed.