UNITED STATES of America, Appellee,

v.

**TWENTIETH CENTURY FOX FILM CORPORATION and Leila J. Goldstein, Defendants–Appellants.**

Nos. 1150, 1151, Dockets 88–1562, 88–1563.

United States Court of Appeals, Second Circuit.

Argued April 11, 1989.

Decided Aug. 9, 1989.

Earl C. Dudley, Jr., Washington, D.C. (Adina N. Amith, Nussbaum, Owen & Webster, Washington, D.C., on the brief), for defendant-appellant Goldstein.

John P. Fonte, U.S. Dept. of Justice, Washington, D.C. (Charles F. Rule, Asst. Atty. Gen., Robert B. Nicholson, Stephen J. Macisaac, Fred E. Haynes, Bernard M. Hollander, Ann Lea Harding, James J. Tierney, U.S. Dept. of Justice, Washington, D.C., on the brief), for appellee.

Carole E. Handler, Gia Rae Paladino, Proskauer, Rose, Goetz & Mendelsohn, Los Angeles, Cal.; Walter J. Josiah, Rhoda L. Clary, Motion Picture Ass'n of America, Inc., New York, N.Y., submitted an amicus curiae brief for the Motion Picture Ass'n of America, Inc.

Mark C. Morril, Matthew Dixon, Kay Collyer & Boose, New York City; Arthur Eisenberg, New York Civil Liberties Union Foundation, New York City, submitted an amicus curiae brief for the New York Civil Liberties Union Foundation.

Before NEWMAN, CARDAMONE and WINTER, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal presents the constitutional question of whether a corporation is entitled to a jury trial in a prosecution for criminal contempt that results in a substantial fine, in this case, $500,000. This question arises on an appeal by Twentieth Century Fox Film Corporation ("Fox") and one of its employees, Leila Goldstein, from a judgment of the District Court for the Southern District of New York (Edmund L. Palmieri, Judge) convicting them, after a two-day bench trial, of criminal contempt for violating a 1951 consent decree. 700 F.Supp. 1242. The decree prohibits motion picture companies and their employees from engaging in various sales practices that violate the antitrust laws.

Although there is ample evidence to support Judge Palmieri's conclusion that Fox and its agent, Goldstein, violated the decree, we conclude that the District Court lacked the power to impose a fine of $500,-

William E. McDaniels, Washington, D.C. (Steven R. Kuney, Kathleen L. Beggs, Peter W. Chatfield, Williams & Connolly, Washington, D.C., on the brief), for defendant-appellant Twentieth Century Fox Film Corp.

000 on Fox after denying the corporation's demand for a jury trial. Accepting the contention that at some point the amount of a fine demonstrates that the contempt is a "serious" offense entitling the contemnor, regardless of its financial circumstances, to a jury trial, we hold that this point is reached once a fine exceeds $100,000. Accordingly, we vacate the penalty imposed on Fox for lack of a jury trial. We affirm Goldstein's conviction in all respects.

### Facts

In 1938, the Government brought an antitrust action against the eight largest motion picture companies in the United States, including Fox. The original complaint alleged that the defendant companies combined to restrain trade in the production, distribution, and exhibition of movies, in violation of the Sherman Anti–Trust Act. The companies engaged in a variety of practices that "eliminate[d] the opportunity for the small competitor to obtain the choice first runs." *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 154, 68 S.Ct. 915, 927–28, 92 L.Ed. 1260 (1948). One of the most common practices was "block-booking"—conditioning the licensing of one film or group of films upon the licensing of one or more additional films. After protracted litigation, *see United States v. Paramount Pictures, Inc.*, 66 F.Supp. 323 (S.D.N.Y.1946), *judgment entered*, 70 F.Supp. 53 (S.D.N.Y.1946), *aff'd in part and rev'd in part*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), *decision on remand*, 85 F.Supp. 881 (S.D.N.Y.1949), *aff'd*, 339 U.S. 974, 70 S.Ct. 1032, 94 L.Ed. 1380 (1950), Fox and the other studios agreed to the entry of a consent decree in 1951, *United States v. Loew's Inc.*, 1950–1951 Trade Cas. (CCH) ¶ 62,861 (S.D.N.Y. 1951). Section II(7) of the decree enjoins Fox from engaging in blockbooking:

The defendant-distributor Twentieth Century–Fox Film Corporation, its officers, agents, servants and employees and its subsidiaries and any successor in interest are hereby enjoined:

. . . .

7. From performing or entering into any license in which the right to exhibit one feature is conditioned upon the licensee's taking one or more other features. *Id.* at 64,545–46.

In 1978 Fox was indicted for violating section II(7) of the decree and, upon its plea of *nolo contendere*, was fined $25,000 plus costs of $18,170.

The litigation at issue on this appeal was initiated in October 1988, when Fox and Goldstein were charged with criminal contempt, pursuant to 18 U.S.C. § 401(3) (1982), for violating section II(7). During the relevant period, Goldstein was employed by Fox as manager of the company's Indianapolis/Milwaukee/Minneapolis branch office, responsible for overseeing the rental and distribution of Fox films in that region. The indictment charged that between 1985 and 1987, the sales activities of Goldstein's branch office violated the consent decree's prohibition of block-booking. Both defendants pled not guilty and requested a jury trial. Goldstein and the Government agreed, with the Court's concurrence, that her maximum penalty, if convicted, would be six months' imprisonment or a $5,000 fine, that her offense was therefore "petty," and that she was not entitled to a jury trial. As to Fox, the District Court ruled that a corporation, facing only a fine, was not entitled to a jury trial, regardless of the amount of the fine.

The indictment concerned the activities of Goldstein's branch office with respect to four sets of films: (1) *Johnny Dangerously* and *Flamingo Kid* (1985); (2) *Cocoon* and *Prizzi's Honor* (1985); (3) *Aliens, Space Camp*, and *Big Trouble in Little China* (1986); and (4) *Mannequin* and *Black Widow* (1987). The Government called eight witnesses: three of Goldstein's subordinates, who were responsible for booking these film releases into movie houses in the Minneapolis territory; three independent film booking agents, who served as middlemen between Fox and smaller theatre operators; and two theatre owners. The subordinates testified that they were instructed by Goldstein to engage in block-booking. For example, when

an employee was meeting resistance in booking *Johnny Dangerously*, but was receiving numerous requests for the concurrently released *Flamingo Kid*, Goldstein suggested to the employee various methods of forcing the exhibitor to rent the less desired film in exchange for rights to the more desired release. One method was to cancel the more desirable film if an exhibitor called to cancel a less desirable film. The Government also introduced into evidence an inter-office memorandum in which Goldstein announced to her staff: "I do not want to see any COCOON dates in a town that does not have PRIZZI'S [HONOR] dated." The memorandum went on to note that if an exhibitor accused a staff member of block-booking, "[j]ust advise him you are selling the pictures in order of availability and PRIZZI'S was our first summer release."

The bulk of the Government's evidence concerned the licensing of *Black Widow* and *Mannequin*. Fox employees in Goldstein's office testified that they were instructed not to accept any *Mannequin* play-dates unless the exhibitor agreed to play *Black Widow* first. If a theatre owner wished to reschedule the *Black Widow* playdate, *Mannequin* would also be moved back so that *Black Widow* would always be shown first. If an exhibitor wanted to cancel *Black Widow*, then *Mannequin* would also be cancelled. An independent booking agent testified that he was told by Goldstein's staff that he would have to play *Black Widow* before he could play *Mannequin*. Another booking agent testified that when he attempted to cancel *Black Widow* playdates, he was told that he would have to play *Black Widow* in order to keep his *Mannequin* dates. Finally, one theatre owner, James Wilson, testified that after he refused to book *Black Widow* into four of his theatres, Goldstein declined to give Wilson *Mannequin* play-dates for these theatres.

Based on the Government witnesses' testimony and supporting documentary evidence, Judge Palmieri found that Goldstein had willfully violated the 1951 consent decree and imposed a fine of $5,000. Relying on the principle that a corporation is criminally liable for the conduct of its managerial employees acting within the scope of their authority, *see United States v. Koppers Co.*, 652 F.2d 290, 298 (2d Cir.), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981), Judge Palmieri also found Fox guilty of criminal contempt and imposed as a penalty a fine of $500,000 plus $40,397 in costs. In a post-trial ruling, Judge Palmieri supplemented his pretrial ruling denying Fox a jury trial with the observation that the $500,000 fine was not large enough to entitle Fox to a jury trial, since this sum represented less than one percent of the company's net earnings for the prior year.

## Discussion

### I. The Merits of the Contempt Conviction

■ As the District Court noted, criminal contempt sanctions may be imposed only if it is proven beyond a reasonable doubt that the contemnor willfully violated the specific and definite terms of a court order. *See SEC v. American Board of Trade, Inc.*, 830 F.2d 431, 439 (2d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1118, 99 L.Ed.2d 278 (1988); *UFI Razor Blades, Inc. v. District 65, Wholesale, Retail, Office & Processing Union*, 610 F.2d 1018, 1024 (2d Cir.1979); *In re Weiss*, 703 F.2d 653, 662 (2d Cir.1983). Fox and Goldstein contend that the evidence was insufficient to support a finding of a violation of the 1951 consent decree. Fox also argues that, to prove its guilt, the Government had to establish not only that Goldstein willfully violated the decree but also that Fox was not "reasonably diligent" in securing compliance with the decree by its employees; since the Government failed to make this showing, Fox argues, the corporation could not be convicted of criminal contempt.

A. *Sufficiency of the Evidence.* Appellants' sufficiency challenge has a dual thrust. They contend that section II(7) of the decree does not prohibit with the requisite clarity the sales practices of Goldstein's branch office and that the evidence of those practices fails to establish a violation of what the decree prohibits. They

claim that, at most, the evidence established the use of high-pressure sales tactics that are merely "attempts to condition" the sale of one license upon another and that the decree requires proof of a license "in which the exhibitor was forced or coerced to license another film." Brief of Appellee Fox at 14.

■ If appellants are contending that the decree prohibits only those licenses containing an express condition that the licensee is obliged to accept another film, the argument is without merit. The decree's prohibition against "entering into or performing any license upon the condition" that another feature is licensed could hardly be limited to licenses containing admissions of violation. The decree prohibits, with unmistakable clarity, the practice of licensing a film to an exhibitor only if the exhibitor agrees to accept a license for another film. Conditioning the license for the desired film is proscribed no matter how subtle or sophisticated are the means used to impose the condition. The evidence fully supported the District Court's conclusion that such a condition was imposed.

Judge Palmieri reasonably relied on the testimony of the independent booking agents and the theatre owners to support his finding that exhibitors agreed to license particular films, such as *Black Widow*, only because without such an agreement they would have been effectively denied access to more desirable films, such as *Mannequin*. Contrary to appellants' assertion that the branch office policy of cancelling play-dates of popular films if exhibitors cancelled play-dates of less popular movies was not prohibited, Judge Palmieri was entitled to conclude that this policy was designed to force exhibitors to retain an unwanted film as the only way to receive a license for a more desirable film, thereby violating the clear terms of the decree.

B. *Willfulness of the Violations.* The record amply demonstrates that Goldstein, a managerial employee of Fox, willfully violated the consent decree while acting within the scope of her authority. Fox argues, however, that even if its branch manager willfully violated the decree, any violation by the corporation was not willful in view of the extensive program Fox adopted to encourage its employees to comply with the decree. At trial, Fox sought to introduce evidence regarding its compliance program, but Judge Palmieri refused to admit it.

■ We agree with the District Court that Fox's compliance program, however extensive, does not immunize the corporation from liability when its employees, acting within the scope of their authority, fail to comply with the law and the consent decree. It is settled law that a corporation may be held criminally responsible for antitrust violations committed by its employees or agents acting within the scope of their authority. *See United States v. Koppers Co.,* 652 F.2d at 298; *see also United States v. Basic Construction Co.,* 711 F.2d 570, 573 (4th Cir.) (per curiam), *cert. denied,* 464 U.S. 956, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983); *United States v. Hilton Hotels Corp.,* 467 F.2d 1000, 1004–07 (9th Cir.1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 938, 35 L.Ed.2d 256 (1973). We see no reason to establish higher standards of proof for corporate violations of antitrust consent decrees than for violations of the antitrust laws themselves.

In attempting to introduce evidence of its "reasonable diligence," Fox seeks to import an element of civil contempt into the criminal context. In *Powell v. Ward,* 643 F.2d 924, 931 (2d Cir.), *cert. denied,* 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981), upon which Fox relies, we held that prison administrators charged with civil contempt for failure to comply with a court order could not be found liable unless, in addition to clear and convincing proof of violation of an unambiguous order, it is also shown that the alleged contemnors had not been reasonably diligent and energetic in attempting to accomplish what the court had ordered. Even if this non-diligence element applies beyond the context of public officials charged with civil contempt for decree violations occurring in the course of discharging their institutional responsibilities, this element has no application to

criminal contempt. The purpose of civil contempt is remedial and coercive; it thus makes sense to say, at least in some contexts, that if a defendant is doing all it can to comply with a court order, there may be little, if any, coercive purpose that civil contempt sanctions could achieve.[1] Criminal contempt, however, serves the much different purpose of vindicating the court's authority. *See United States v. United Mine Workers*, 330 U.S. 258, 303, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947). It serves to punish individuals or corporations for past violations of a court order. Because of this different purpose, the focus of criminal contempt is on the willfulness of the violation. Once it is determined that the corporate agent willfully violated a clear contempt order, the corporation must bear responsibility. It is this rule of vicarious liability that encourages companies to establish compliance programs. Were we to import "reasonable diligence" into the law of criminal contempt, corporations could more easily distance themselves from the wayward acts of their agents—a prospect that threatens the very authority of the court that criminal contempt is designed to preserve.[2]

## II. Fox's Right to a Jury Trial

The Sixth Amendment to the Constitution guarantees defendants the right to a trial by jury in "all criminal prosecutions." Despite the Amendment's broad language, however, the Supreme Court long ago established the rule that "so-called 'petty' offenses may be tried without a jury."

*Frank v. United States*, 395 U.S. 147, 148, 89 S.Ct. 1503, 1505, 23 L.Ed.2d 162 (1969). Until the late 1960's, the federal courts declined to make the right to a jury trial available in criminal contempt cases. Contempt was viewed as *sui generis*, with historical roots in the common law, under which it had always been tried without a jury. It was also thought that the courts' power to ensure the smooth administration of justice would be fettered by the interposition of the jury. *See, e.g., Green v. United States*, 356 U.S. 165, 183–87, 78 S.Ct. 632, 642–45, 2 L.Ed.2d 672 (1958); *see also* cases collected in *id.* at 191 n. 2, 78 S.Ct. at 635 n. 2 (Frankfurter, J., concurring).

However, as courts began to impose increasingly severe penalties for criminal contempts, such as substantial terms of imprisonment, the Supreme Court placed criminal contempt on the same footing with other criminal prosecutions, at least for the limited purpose of determining the defendant's right to a jury trial. Thus in criminal contempt cases "[t]he defendant is entitled to a jury trial unless the particular offense can be classified as 'petty.'" *Frank v. United States*, 395 U.S. at 148, 89 S.Ct. at 1505; *see Bloom v. Illinois*, 391 U.S. 194, 211, 88 S.Ct. 1477, 1487, 20 L.Ed.2d 522 (1968) (twenty-four months' imprisonment for contempt conviction was "serious" offense).

In ordinary criminal prosecutions, a relevant standard for gauging the severity of an offense is the maximum penalty authorized by law. *See District of Columbia v.*

---

1. However, civil contempt sanctions could still achieve remedial purposes by obliging defendants to provide compensation for damages caused by actions of their employees in violation of court decrees.

2. Fox cites two Seventh Circuit cases for the proposition that evidence of reasonable compliance may negate vicarious corporate responsibility for an agent's violation of a court order. *See United States v. Greyhound Corp.*, 508 F.2d 529 (7th Cir.1974); *United States ex rel. Porter v. Kroger Grocery & Baking Co.*, 163 F.2d 168, 175 (7th Cir.1947). However, neither case is apposite. In *Greyhound*, though the Court looked to the corporation's alleged efforts at compliance, it did so because the contempt petition charged that the corporation's failure adequately to in-

struct its agents as to decree compliance was itself a violation of the decree. *Kroger* involved violations of price regulations promulgated by the Office of Price Administration. The Court held that the Government failed to prove willfulness because the corporation took every possible step to insure compliance with the court order *and* because low-level employees actually committing the violations were unaware that they were violating the order. Thus, there was no willfulness on the part of the employees to impute to the corporation. Neither *Greyhound* nor *Kroger* stand for the proposition that a corporate agent's willful violation of a court order will not be imputed to the corporation because of the corporation's reasonable diligence in attempting to comply with the order.

*Clawans,* 300 U.S. 617, 57 S.Ct. 660, 81 L.Ed. 843 (1937). Since *Clawans,* federal courts have consistently looked to the maximum authorized punishment as the principal benchmark for distinguishing between petty and serious crimes. *See Baldwin v. New York,* 399 U.S. 66, 69, 90 S.Ct. 1886, 1888, 26 L.Ed.2d 437 (1970); *Bloom v. Illinois,* 391 U.S. at 211, 88 S.Ct. at 1487; *Duncan v. Louisiana,* 391 U.S. 145, 159–61, 88 S.Ct. 1444, 1452–54, 20 L.Ed.2d 491 (1968). However, the Supreme Court has acknowledged that this measure of severity is inapplicable in federal criminal contempt cases because there are no statutory limits on the maximum allowable penalties. In criminal contempt prosecutions, courts "are to look to the penalty actually imposed as the best evidence of the seriousness of the offense." *Bloom v. Illinois,* 391 U.S. at 211, 88 S.Ct. at 1487. Although language in *Bloom* suggests that a defendant may have a right to a jury trial whenever serious punishment is even "contemplated," *id.* at 208, 88 S.Ct. at 1485, the rule as stated in *Bloom* and as followed in its progeny is that *actual* punishment is the relevant criterion.[3] *See Frank v. United States,* 395 U.S. at 149, 89 S.Ct. at 1505.

▆ For individuals charged with criminal contempt, the highest penalty that may be imposed without a jury trial is generally six months' imprisonment. *See Muniz v. Hoffman,* 422 U.S. 454, 476, 95 S.Ct. 2178, 2190, 45 L.Ed.2d 319 (1975). Since a defendant charged with ordinary crimes is entitled to a jury trial whenever the offense carries a maximum authorized prison term of more than six months, *Baldwin v. New York,* 399 U.S. at 69, 90 S.Ct. at 1888, *Bloom* requires that a criminal contempt with an imposed penalty of more than six months' imprisonment is a "serious" offense, entitling the individual contemnor to a jury trial.[4]

For corporations charged with criminal contempt, where the penal sanctions are only monetary, it is an open question whether any level of punishment establishes their contempts as serious for purposes of entitlement to a jury trial. In *Muniz v. Hoffman, supra,* the Supreme Court expressly declined to determine whether "there is ... [a] constitutional right to a jury trial in any criminal contempt case where only a fine is imposed on a corporation or labor union." 422 U.S. at 477, 95 S.Ct. at 2191. But the Court found that a $10,000 fine imposed on a 13,000-member labor union was not so serious as to deprive the union of whatever Sixth Amendment right to a jury trial it might have. The Court took note of the statutory definition of a petty offense then in force—punishment not in excess of six months' imprisonment or a $500 fine, or both, *see* 18 U.S.C. § 1(3) (1930) (amended 1985, repealed 1987, current version at 18 U.S.C.A. §§ 19, 3571(b)(6)–(7), (c)(6)–(7) (West Supp. 1989)), but chose not to adopt this definition as the criterion for jury trials in criminal contempts. Without establishing a constitutional standard for the amount of criminal contempt fines that may be imposed on corporate defendants without a jury trial, *Muniz* made clear that the imprisonment threshold for serious offenses does not have the same pertinence as the fine threshold in determining a contemnor's entitlement to a jury trial:

> [W]e cannot accept the proposition that a contempt must be considered a serious

---

**3.** A consequence of determining after sentence is imposed whether a criminal contempt is "serious" is that the right to a jury trial may not be clear until after the trial. To avoid the risk of reversal for lack of a jury trial the prosecution frequently announces prior to trial (as it did with respect to appellant Goldstein) that it is seeking no more than a penalty within the limits of a petty offense.

**4.** The Court has recently held that a defendant exposed to a maximum prison term of six months or less is presumed to be charged with a "petty" offense unless "he can demonstrate that any additional statutory penalties, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one." *Blanton v. City of North Las Vegas,* — U.S. —, 109 S.Ct. 1289, 1293, 103 L.Ed.2d 550 (1989) (six-month prison term and maximum $1000 fine does not indicate that offense is serious). Presumably, a contemnor sentenced to less than six months' imprisonment would face a similar burden.

crime under all circumstances where the punishment is a fine of more than $500, unaccompanied by imprisonment. It is one thing to hold that deprivation of an individual's liberty beyond a six-month term should not be imposed without the protections of a jury trial, but it is quite another to suggest that, regardless of the circumstances, a jury is required where any fine greater than $500 is contemplated. *From the standpoint of determining the seriousness of the risk and the extent of the possible deprivation faced by a contemnor, imprisonment and fines are intrinsically different.*

*Muniz,* 422 U.S. at 477, 95 S.Ct. at 2190–91 (emphasis added). Without deciding whether a contemnor other than an individual is ever entitled to a jury in a criminal contempt case, the Court suggested that, at least for a fine of $10,000, seriousness of the offense for purposes of a possible right to a jury would turn on the burden of the fine upon the particular contemnor:

> The union, the respondent suggests, collects dues from some 13,000 persons; and although the fine is not insubstantial, it is not of such magnitude that the union was deprived of whatever right to jury trial it might have under the Sixth Amendment.

*Id.* at 477, 95 S.Ct. at 2191.

In *United States v. Troxler Hosiery Co.,* 681 F.2d 934 (4th Cir.1982), the Fourth Circuit applied this suggestion to uphold a criminal contempt fine of $80,000 imposed, without a jury trial, on a corporation with a net worth of $540,000. This Court has also suggested that it is appropriate to consider the financial resources of a corporate defendant in determining whether a criminal contempt is "serious." In *Musidor, B.V. v. Great American Screen,* 658 F.2d 60, 66 (2d Cir.1981), we held that a fine of $10,000 did not deprive a corporate defendant of its right to a jury trial, where the penalty represented fifteen percent of gross revenues from illicit sales. However, *Musidor* is of limited force on the issue of when a corporate contemnor is entitled to a jury trial since the decision relied in part on the fact that a jury trial had not been requested.

The Government contends that a corporation charged with criminal contempt is never entitled to a jury trial and that, even if such a right attaches at some level of fine, the $500,000 fine imposed on Fox was not so high as to require a jury trial since it represents far less than even one percent of the corporation's net worth. Fox and the *amicus curiae,* New York Civil Liberties Union, respond that at some dollar amount a fine requires a jury trial, regardless of a corporate contemnor's financial resources, and they urge that this level is $10,000, the current statutory limit for petty offense fines imposed on corporations and other organizations. We hold that the jury trial guarantee of the Sixth Amendment is not entirely unavailable to corporate defendants charged with criminal contempt, that there is an absolute dollar amount of fines above which the Sixth Amendment entitles all corporations and other organizations to a jury trial for criminal contempts, regardless of the contemnor's financial resources, and that this amount is $100,000.

Interpreting the Sixth Amendment to permit a fine of any amount to be imposed on corporations convicted of criminal contempt without a jury trial would show inadequate respect for the Amendment's general preference for a jury trial in criminal cases. Once *Bloom* abandoned the notion that criminal contempts were so special as to be totally exempt from the scope of the jury trial guarantee, the contention that one category of defendants could be punished up to the limit of the Excessive Fines Clause of the Eighth Amendment without a jury trial became untenable. No other court except the District Court in this case has ruled that corporate contemnors have no jury trial rights.[5] We decline to commit this Circuit to such an extreme position.

---

5. Two circuits have ruled that corporate contemnors have the same jury trial rights as individuals. *United States v. Troxler Hosiery Co.,* *supra; United States v. R.L. Polk & Co.,* 438 F.2d 377, 379 n. * (6th Cir.1971). The Government relies on *United States v. United Mine Workers,*

■ Once it is determined that the Sixth Amendment guarantees corporate contemnors a jury trial at some level of punishment severity, the issue becomes whether that level is always to be determined relatively by comparing the amount of a fine to the corporation's financial resources, or whether at some absolute dollar amount a fine is so serious as to require a jury trial regardless of the contemnor's financial condition. While the "relative" approach is appropriate to determine whether fines of fairly modest proportions have such a significant impact upon the contemnor that the offense should be deemed "serious" for jury trial purposes, we believe that, just as there is a six-month threshold that determines when imprisonment is "serious," there must be some dollar threshold applicable to fines. This interpretation keeps faith with the core principle of *Frank* and *Bloom* that the substantiality of the contempt penalty determines the availability of the right to a jury. No matter how prosperous a corporation may be, a large fine is a punishment of significance, and at some point the amount of a fine indicates that an offense is serious, no matter how substantial the financial reserves of the contemnor. An amendment that guarantees a jury trial for all offenses that are "serious" would be trivialized by an interpretation that renders it inapplicable, for example, to a fine of $1,000,000.

Furthermore, there is a practical reason for establishing some absolute dollar threshold. Since the amount of punishment imposed, rather than authorized, determines the availability of a jury for criminal contempts, the absence of a dollar threshold would create needless trial uncertainty in those cases where a corporation with considerable resources is likely to be fined a substantial sum. Unlike the situation with individuals, where the six-month threshold permits a court to determine at the outset that a jury is not required by limiting the defendant's maximum exposure to six months' punishment, a corporation entitled to a jury only upon a comparison of the fine to its resources would normally not know if it was entitled to a jury until after the trial had been held. To avoid this bizarre result, a court wishing to conduct a constitutionally valid non-jury criminal contempt trial would either have to hold a pretrial hearing as to the corporation's financial resources (itself an odd procedure), or else select as the maximum exposure a dollar amount for a fine that was clearly petty in relation to a low estimate of what a post-trial hearing would likely reveal about the corporation's financial resources.

The principal argument against setting an absolute dollar threshold is that any amount selected will yield results that appear arbitrary. Once a dollar level is set as the maximum fine that may be imposed without a jury, a jury becomes available whenever a fine exceeds the threshold by even one dollar. But as the Supreme Court has observed, the effort to "draw a line in the spectrum of crime ... cannot be wholly satisfactory, for it requires attaching different consequences to events which, when they lie near the line, actually differ very little." *Duncan v. Louisiana,* 391 U.S. at 160–61, 88 S.Ct. at 1453. Nevertheless, "[i]n the absence of an explicit constitutional provision, the definitional task necessarily falls on the courts." *Id.* at 160, 88 S.Ct. at 1453.

Turning, then, to the task of drawing the dollar line for fines above which corporate contemnors are entitled to a jury trial, we encounter differing guidance. With respect to ordinary crimes, the Supreme Court has said that the line for serious offenses is to be drawn with reference to "objective criteria, chiefly the existing laws and practices in the Nation." *Duncan v. Louisiana,* 391 U.S. at 161, 88 S.Ct. at

---

330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947), for the proposition that the Supreme Court has upheld the power of courts to impose substantial fines on unions and corporations without the interposition of a jury. Though a $700,000 criminal contempt fine was imposed on the union in *United Mine Workers, id.* at 305, 67 S.Ct. at 702, the right to a jury trial was neither raised by the union nor adjudicated by the Court. In any event, the issue is open after *Bloom* and *Frank,* as the Supreme Court explicitly stated in *Muniz.*

1453. Yet when the Court was urged to use what seemed to be the most relevant objective criterion for setting the limit on non-jury criminal contempt punishments—the statutory definition of petty offenses, it declined to do so, stating that for purposes of determining whether criminal contempt punishments were serious, this definition has "no talismanic significance." *Muniz v. Hoffman,* 422 U.S. at 477, 95 S.Ct. at 2190.

Nevertheless, Fox and the NYCLU urge us to use the current petty offense limit on fines for organizations, now that this limit has been raised to $10,000. 18 U.S.C.A. §§ 19, 3571(c)(6), (7) (West Supp.1989). But the statutory definition does not become talismanic just because the statutory petty offense line has been raised from $500 to $10,000, and the increased amount strikes us as too low a figure always to be deemed the criterion of a serious criminal contempt offense by a corporation or other organization, especially in light of *Musidor.*

█ Looking elsewhere for "objective criteria," we encounter the normal maximum fine Congress has established for organizations convicted of felonies—$500,-000, 18 U.S.C.A. § 3571(c)(3) (West Supp. 1989).[6] It seems unwarranted, however, to believe that the *minimum* level of a fine at which an organization would be entitled to a jury for a criminal contempt would be equal to the *maximum* fine that could normally be imposed for most felonies. The congressional judgment that $500,000 is an appropriate maximum felony fine indicates to us that some significant portion of this figure is the appropriate threshold for determining an organization's right to a jury trial. We conclude that the jury right is available for a criminal contempt whenever the fine imposed on an organization exceeds $100,000.

For fines below the $100,000 threshold, it will remain appropriate to consider whether the fine has such a significant financial impact upon a particular organization as to indicate that the punishment is for a seri-

ous offense, requiring a jury trial. We need not consider what the appropriate fine threshold would be for individuals charged with criminal contempt. *See Douglass v. First National Realty Corp.,* 543 F.2d 894 (D.C.Cir.1976) (setting $500 as the limit for non-jury criminal contempt fines imposed on individuals).

Normally, a conclusion that a conviction has been obtained without a jury trial to which the defendant was entitled would require an order for a new trial. However, Fox contends that in the event we accept only its contention regarding entitlement to a jury, we should either order a new trial or "remit" the fine down to the $10,000 that Fox contends is the constitutional limit that may be imposed without a jury. This alternative form of relief is doubtless urged in recognition of the fact that the right to a jury trial in criminal contempt cases turns on the punishment imposed. Though Fox might be willing to have us order this novel form of remittitur despite our conclusion that the constitutional limit is $100,000, we do not believe that the choice of remedy belongs to the contemnor. In criminal contempt cases, the Government frequently chooses whether to seek a penalty above the line where a jury is required, and in this case the Government may prefer to seek a fine up to the amount imposed by Judge Palmieri, even though that would entail a retrial before a jury. Moreover, since criminal contempt vindicates the authority of the court, the District Court may have a legitimate voice in the choice of relief. Under the circumstances, we will do no more than vacate the penalty that has been imposed on Fox and remand the case against Fox "for proceedings not inconsistent with this opinion." *Bloom v. Illinois,* 391 U.S. at 211, 88 S.Ct. at 1487.

### III. Goldstein's Venue Challenge

█ Goldstein contends that the Southern District of New York was not the proper venue for contempt proceedings against

---

6. The $500,000 normal maximum may be exceeded where the statute proscribing the offense establishes a higher penalty, *e.g.,* 15 U.S.C.A. § 1 (West Supp.1989) ($1,000,000 for violating sec-

tion 1 of the Sherman Antitrust Act), or where twice the defendant's gain or twice the victim's loss equals a larger sum. 18 U.S.C.A. § 3571(c)(1)-(2), (d) (West Supp.1989).

her. She claims that since all the alleged violations of the consent decree occurred in Minnesota and Illinois, she is entitled under the Sixth Amendment to a trial in the states and districts where the offenses were allegedly committed. We do not agree. In *Myers v. United States*, 264 U.S. 95, 103, 44 S.Ct. 272, 273, 68 L.Ed. 577 (1924), the Supreme Court squarely rejected the argument that a district court's contempt power is limited to offenses occurring within the territorial limits of that court. Goldstein acknowledges that *Myers* has not been overruled, but suggests that it has been eroded by the statement in *Bloom v. Illinois*, 391 U.S. at 201, 88 S.Ct. at 1481, that "[c]riminal contempt is a crime in the ordinary sense." Though *Bloom* accorded a jury trial right to those charged with serious contempt offenses, we do not think that decision intended to import the full panoply of Sixth Amendment rights into contempt proceedings. *See Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 796–97, 107 S.Ct. 2124, 2131–32, 95 L.Ed.2d 740 (1987). *Bloom* does not mention *Myers* or the issue of venue. Even if there were stronger evidence that *Myers* has lost its vitality, we have only recently been reminded to "follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, — U.S. —, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). *See Salerno v. American League of Professional Baseball Clubs*, 429 F.2d 1003, 1005 (2d Cir. 1970), *cert. denied*, 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971).

■ Finally, we reject Goldstein's claim that the $5,000 fine imposed on her indicated that her offense was serious for purposes of entitling her to a jury trial. The

record indicates that her counsel conceded that such a fine was below the line of serious offenses and in any case waived whatever right Goldstein may have had to a jury trial.[7]

### Conclusion

With respect to Goldstein, the judgment of the District Court is affirmed; with respect to Fox, the penalty is vacated for lack of a jury trial, and the case is remanded for proceedings not inconsistent with this opinion.

---

7. The classification of Goldstein's offense as petty raises the possible argument that Fox must also be guilty of no more than a petty offense, since its liability arises vicariously based on the conduct of its agent. However, as we have noted, the classification of a criminal contempt turns on the penalty imposed, and in this case the penalty imposed upon Fox established its offense as serious. Moreover, whether or not we would have made some revision in the $500,-

000 fine imposed on Fox in the exercise of our authority to revise criminal contempt sentences, *see Cheff v. Schnackenberg*, 384 U.S. 373, 380, 86 S.Ct. 1523, 1526, 16 L.Ed.2d 629 (1966), had we not concluded that the contempt penalty must be vacated for lack of a jury trial, we see nothing improper in imposing upon a corporate contemnor a more substantial fine than the one imposed on the agent for whose misconduct the corporation is liable.