The PROCTER & GAMBLE
COMPANY, Plaintiff,

v.

BANKERS TRUST COMPANY and BT
Securities Corporation, Defendants.

No. C–1–94–735.

United States District Court,
S.D. Ohio,
Western Division.

Oct. 3, 1995.

Thomas S. Calder, John D. Luken, Dinsmore & Shohl, Cincinnati, OH, Stanley M. Chesley, Waite, Schneider, Bayless & Chesley, Cincinnati, OH, James J. Johnson, General Counsel, Gary Hagopian, Procter & Gamble Co., Cincinnati, OH, Matthew Gluck, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Procter & Gamble Co.

Thomas Ridgley, Glenn V. Whitaker, Daniel J. Buckley, Vorys, Sater, Seymour & Pease, Cincinnati, OH, Michael A. Cooper, Richard H. Klapper, Sullivan & Cromwell, New York City, Michael E. Wiles, Debevoise & Plimpton, New York City, for Bankers Trust Co.

Richard M. Goehler, Christopher Ehrman, Frost & Jacobs, Cincinnati, OH, Victor A. Kovner, Lankenau Kovner & Kurtz, New York City (Kenneth M. Vittor, Sr. Vice Pres. & General Counsel, The McGraw–Hill Cos., Inc., New York City, of counsel), for McGraw–Hill.

## OPINION AND ORDER REGARDING McGRAW–HILL COMPANIES, INC. v. PROCTER & GAMBLE COMPANY, ET AL.

FEIKENS, District Judge.

### I. *Background*

On October 27, 1994, plaintiff, The Procter & Gamble Company (P & G), filed suit against defendants, Bankers Trust Company and BT Securities Corporation, in the United States District Court for the Southern District of Ohio. Plaintiff alleged that defendants had engaged in fraudulent conduct to induce plaintiff to enter into and to remain in two complex leveraged derivative transactions. The case was assigned to the Honorable Carl B. Rubin, and on January 17, 1995, he signed a stipulated protective order, thereby protecting confidential materials produced in discovery. Regrettably, Judge Rubin became ill and died, and Chief Judge Gilbert S. Merritt designated me to handle the case.

On September 1, 1995, plaintiff filed a motion for leave to amend its complaint together with a supporting memorandum and a RICO (Organized Crime Control Act of 1970, 18 U.S.C. § 1961, *et seq.*) case statement. These supporting materials, which include allegations of RICO violations and utilize confidential discovery information, were filed under seal pursuant to the terms of the protective order.

At or about 5:00 p.m. on September 13, 1995, plaintiff and defendants' counsel contacted me and jointly requested a restraining order to enforce the protective order. The parties sought to prevent The McGraw–Hill Companies, Inc., doing business as *Business Week* Magazine, from publishing that evening a story which included confidential information regarding Procter & Gamble's mo-

tion for leave to amend. I concluded that the parties would suffer irreparable harm and issued a restraining order prohibiting publication of the court-protected confidential information. This order only prohibited publication until consent to publish was received from this court and did not limit access to trial proceedings, restrain publication of information revealed at trial, or restrain information that was obtained independently of the discovery process.

Rather than seek a hearing in this court either that evening or the next day, *Business Week* sought expedited review in the United States Court of Appeals for the Sixth Circuit. Five days later, on September 18, 1995, that court dismissed that appeal for lack of jurisdiction. Rather than move for a hearing in this court, *Business Week* again sought appellate review, this time with the United States Supreme Court. Simultaneously, Bankers Trust sought a show cause hearing in this court. That hearing was scheduled for Thursday, September 21. *Business Week* vociferously argued that such a hearing was premature and sought an emergency stay from the Sixth Circuit Court of Appeals. That motion was denied and the hearing occurred as scheduled. It is significant that *Business Week*, while repeatedly arguing in appellate courts and to the media that it had been denied a hearing on my restraining order, vigorously opposed and avoided such a hearing from the very beginning. The reason for this duplicity became clear when factfinding hearings were finally held.

## II. *The Need for a Hearing*

While the temporary restraining order entered on September 13 was issued under exigent circumstances, I was always available to provide a full hearing. Finally, after much delay precipitated by the appeals of *Business Week*, I held hearings on my order restraining *Business Week* on Thursday, September 21, and Wednesday, September 27, 1995. The purpose of these hearings was to determine whether the protected, confidential information obtained by *Business Week* was acquired *lawfully and independently of the discovery process*. As suggested by Justice John Paul Stevens in his denial of *Business Week*'s application for a stay pending the filing of a petition for *certiorari*, the manner in which *Business Week* came into possession of the protected discovery information has an important bearing on its right to publish it. *See The McGraw–Hill Companies, Inc. v. Procter & Gamble Company, et al.,* —— U.S. ——, 116 S.Ct. 6, 132 L.Ed.2d 892 (U.S. 1995). Moreover, as will be discussed in greater detail below, the Supreme Court has explicitly limited the right to disseminate court-protected information which is obtained only through the civil discovery process.

## III. *Contentions of the Parties*

*Business Week* has contended throughout this case that there was no need for a hearing because the September 13, 1995 restraining order was a prior restraint in violation of the First Amendment of the United States Constitution. Citing *New York Times Company v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), *Business Week* argued that it is irrelevant how it obtained the protected information because, once the press has obtained information, it is irrelevant whether it acquired it illegally. Alternatively, *Business Week* has argued that it obtained the information legally, even though it resisted a hearing.

Defendants and plaintiff have insisted that *Business Week*, with full knowledge of the protective order, obtained the confidential documents illegally and by duping a Bankers Trust attorney. Defendants have sought a permanent injunction prohibiting Business Week from publishing the court-protected confidential information.

## IV. *Findings of Fact*

*Business Week* contends that the confidential documents (the memorandum in support of the motion to amend, the proposed amended complaint and the RICO case statement) fortuitously fell into its lap and that when this serendipitous event occurred, it was unaware of the protective order sealing these documents. Two days of evidentiary hearings have made it clear, however, that *Business Week* knew that these documents were sealed and unavailable while it actively attempted and eventually succeeded in pro-

curing them. During the evidentiary hearing there was uncontroverted testimony that Zachary Schiller, Cleveland Bureau Chief for *Business Week,* was aware of the protective order well before the sealed documents at issue were filed. Greg Rossiter, Supervisor of Corporate Communications for Procter & Gamble, testified that he and Schiller were in regular contact regarding Procter & Gamble's lawsuit against Bankers Trust. Rossiter testified that he discussed with Schiller the existence of the protective order in June and July 1995, when Schiller inquired about the filing of a writ of mandamus in the case. It is noteworthy that during his testimony Schiller did not deny he was so informed.

On August 31, Rossiter alerted Schiller to an unspecified, impending development in the case that he thought Schiller would find of interest for a story Schiller was preparing. Rossiter encouraged Schiller to look for a new filing in the case. Acting on this tip, Schiller sent a stringer, Joseph Levy, to the Clerk's Office of the U.S. District Court in Cincinnati, Ohio, on Wednesday, September 6. He instructed Levy to obtain any new filings in the Procter & Gamble case. Rossiter testified that Schiller called him on September 6 and stated that he had received a copy of the motion to amend from his stringer, but wanted to know if he could somehow obtain the documents attached to it. Rossiter stated that he informed Schiller that they were under seal and unavailable to the public.

Schiller denies that he was so reminded of the protective order or informed that the documents supporting the motion to amend were sealed. Schiller testified that the stringer was unable to obtain any documents until a second trip to the courthouse on September 7. He claims that he only called Rossiter on September 6 to inquire as to whether any new filings had actually occurred because Levy was having difficulty acquiring the documents.

Levy testified that he had experience in obtaining court documents but inexplicably had problems when he went to the courthouse on September 6. He stated that he went to the District Court Clerk's Office four times on the afternoon of September 6. He stated that the first time he was told there were no new filings. On the second visit, he was told that there was a motion but that the Clerk's Office did not have "any papers on it." On the third visit, after calling Schiller and again being told to get the new filing, Levy testified that the clerk "basically said that the papers had been lost or not exactly lost, that they weren't readily available, that they were somewhere in the court building floating around essentially." Transcript of Sept. 27, 1995 Proceedings (Tr.) at 36. Levy stated that he then stepped out, got a drink of water, and that "they located some papers" and "[w]hen I got back they handed me three pieces of paper with the motion." *Id.* at 36. Levy claims he then called Schiller and read the motion to him over the phone.

This perplexing testimony is further complicated by Levy's admitted review of the docket sheet in this case. Levy testified that on his second visit to the Clerk's Office he and a clerk reviewed the docket sheet on a computer screen. While it is hard to believe that Levy, as a professional journalist, did not notice that the docket sheet showed that the new filing was filed under seal, it is incomprehensible that the court clerk would have missed this capitalized notation and not so informed Levy.

Levy further testified that Schiller called him on Thursday, September 7, and requested that he return to the district court to obtain the documents attached to the motion to amend. He stated that when he returned that afternoon, he was informed that the documents were sealed and unavailable. He also testified that he informed Schiller of this reality that same afternoon. Therefore, even if one does accept the dubious testimony of Levy, the Cleveland Bureau Chief for *Business Week,* Schiller knew the documents at issue were sealed as of September 7, six full days before this court was compelled to enter its temporary restraining order.

The testimony of Schiller is even less credible than that of Levy. In response to important questions Schiller was either equivocal or simply stated he could not "recall"

what his conduct had been.[1]

Schiller's testimony was also compromised by the contradiction between his testimony and his actions. He testified that he would have taken seriously the protective order if he had been aware of it. However, when he learned that the documents were sealed, he did not so inform the reporters working on the case because he was too busy doing other things and because the story had a low priority, even though he knew that at least one of them, Linda Himelstein, was actively attempting to obtain the documents.

Schiller claimed that he was preparing for an interview for an unrelated story and for a two and one-half day trip to San Francisco. Yet, this was four days before Schiller was to leave for California. On Wednesday, September 6, and Thursday, September 7, Schiller admittedly was in constant contact with his reporters. He also called attorneys for plaintiff on September 6 and 7 in an admitted attempt to get the documents. He even e-mailed one of the reporters and informed her that "[o]ne way or another, we'll get the P & G filing." Finally, Schiller gave no reason as to why on Friday, September 8, and Saturday, September 9, he could not inform his reporters of the protective order, even though he was in his office on both days.

The sealed documents in this case were actually obtained by Himelstein. She testified that she acquired the documents on behalf of McGraw–Hill from a "confidential source" on Tuesday, September 12. Himelstein, an accomplished legal reporter who has written hundreds of stories regarding business and the law, acknowledged that she knew what protective orders are and that 99.9% of pleadings are public documents. Given this understanding, it is not difficult to understand why she would turn to "confidential sources" to procure documents after Schiller had informed her that he could not obtain the documents.

On the second day of hearings, September 27, it was learned that this confidential source was Steven Holley, a partner in the law firm of Sullivan & Cromwell. While Sullivan & Cromwell represents Bankers Trust in the Procter & Gamble suit, Holley was not working on the case. Himelstein called Holley, a person with whom she had previously become acquainted, chatted a while, and then off-handedly asked if he had a copy of the Bankers Trust complaint that contained the RICO claim. He said no, but since it was a pleading, he was confident he could find one. Holley called an associate on the case, Richard Pepperman, and requested

---

1. Q. Have you attempted to obtain, in other matters, documents that you knew were filed under seal?

A. I'm not sure. Not that I can recall exactly. I have seen certain documents under seal, just the outsides of them, but no.

THE COURT: Ever?

THE WITNESS: Well maybe I don't understand the question properly.

THE COURT: Put it to him again.

Q. Yes. Have you ever, not in this case, but in any matter, when you have been advised that something was filed under seal, have you continued to attempt to obtain them?

A. I really can't recall. Not that I remember. It's possible, but I don't remember ever trying to do that exactly.

Q. In fact, you take seriously, if a protective order is in place and documents are filed under seal in a court, you wouldn't attempt to go behind that, would you?

A. No. Generally, I wouldn't.

THE COURT: What does "generally" mean?

THE WITNESS: Well, it means hard to predict my course of conduct in the future of every instance that I might be confronted with. I don't think I would do that, no.

Tr. at 81–82.

. . . .

Q: When did you first disclose to anyone in New York that these documents were under seal?

A: It was sometime, sometime on the 13th. I imagine it was, I don't know, late morning or something. I don't really remember when exactly I told them.

Q: So it's your testimony that you had conversations with Kelley Holland or perhaps others in New York before you disclosed to them that these documents were under seal?

A: Well, I probably mentioned it to her. I can't recall. We had a whole variety of conversations that day, and exactly when we might have discussed this in detail I can't recall.

Q: In the deliberative process leading up to the decision to publish that evening, did you disclose to anyone in New York that as early as September 7th you knew that the documents that had been obtained were under seal?

A: I don't recall telling them that then. I really don't remember.

THE COURT: You think you might have?

THE WITNESS: *I doubt it, but I'm not sure really.* (Emphasis added)
*Id.* at 92–93.

a copy of the complaint. Pepperman did not indicate the document was sealed, Holley picked it up, and then left it for a courier from Himelstein. Notwithstanding this bizarre development, *Business Week* still continues disingenuously to say that it did not know it was dealing with court-protected materials.

■ With these findings, I conclude that *Business Week* was aware of the protective order before it obtained the sealed documents and that *Business Week* actively sought to obtain the sealed documents while it knew of the protective order. Moreover, Schiller's knowledge and intent concerning the protective order and the sealed documents are properly imputed to *Business Week*. It is well settled that notice to an agent, while acting for his principal, as to facts affecting the character of the transaction, is constructive notice to the principal. *Restatement (Second) of Agency* § 268. Similarly, knowledge acquired by an agent acting within the scope of his authority is imputed to the principal. *Restatement (Second) of Agency* § 272.

The U.S. Court of Appeals for the Sixth Circuit has applied these rules in holding that corporations may be held liable for the acts of employees, even in the criminal context. In *Continental Baking Co. v. United States,* 281 F.2d 137 (6th Cir.1960), a case involving illegal price-fixing, the Sixth Circuit held a corporation liable for the acts of a plant manager who had authority over corporate prices in his district. The court explained that where there is "an officer or agent of a corporation with broad express authority, generally holding a position of some responsibility, who performs a criminal act related to the corporate principal's business," the corporation will be held liable "so long as the criminal act is directly related to the performance of the duties which the officer or agent has the broad authority to perform." *Id.* at 149. The court emphasized

that a corporation "cannot divorce itself from its responsible agent to insulate itself from criminal prosecution." *Id.* at 150.

In *United States v. Carter,* 311 F.2d 934 (6th Cir.), *cert. denied sub nom. Felice v. United States,* 373 U.S. 915, 83 S.Ct. 1301, 10 L.Ed.2d 415 (1963), the Sixth Circuit noted that "a corporation, through the conduct of its agents and employees, may be convicted of a crime, including a crime involving knowledge and willfulness," so long as the agent's illegal acts are "related to and done within the course of his employment and have some connection with the furtherance of the business of such corporation." *Id.* at 941. The court concluded that the "knowledge and willfulness" of the defendant's president "must be charged" to the corporation, and explained: "The corporate person can only act and know through its officers, and the guilty knowledge and willful conduct of its chief executive officer will be charged to the corporate person." *Id.* at 942 (citing authorities).

The decisions in *Continental Baking* and *Carter* are two of many federal decisions which hold that corporations may be held criminally liable for unlawful acts of agents who were acting within the scope of their employment and with the intent to benefit the corporation.[2] Under such circumstances, the knowledge, willfulness, and intent of the agent are properly imputed to the corporation, and courts have so held.[3]

The rules holding that an agent's knowledge, willfulness and intent are properly imputed to his principal are equally applicable to claims that a corporation has acted in violation of a judicial order or decree. In *United States v. Cable News Network,* 865 F.Supp. 1549 (S.D.Fla.1994), for example, the court held that, based on the acts of its employees, CNN "knowingly and wilfully violated the court's restraining order." *Id.* at 1564. To similar effect, in *United States v.*

---

**2.** *See, e.g., United States v. Automated Medical Laboratories, Inc.,* 770 F.2d 399 (4th Cir.1985); *United States v. Gold,* 743 F.2d 800 (11th Cir. 1984), *cert. denied* 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985); *United States v. Bi–Co Pavers, Inc.,* 741 F.2d 730 (5th Cir.1984); *United States v. Demauro,* 581 F.2d 50 (2d Cir.1978).

**3.** *See, e.g., United States v. Investment Enterprises,* 10 F.3d 263, 267 (4th Cir.1985); *United States v. Bank of New England, N.A.,* 821 F.2d 844, 856–57 (1st Cir.1987), *cert. denied,* 484 U.S. 943, 108 S.Ct. 328, 98 L.Ed.2d 356 (1987).

*Twentieth Century Fox Film Corp.*, 882 F.2d 656 (2d Cir.1989), *cert. denied*, 493 U.S. 1021, 110 S.Ct. 722, 107 L.Ed.2d 741 (1990), the court held a corporation liable for the knowing and willful conduct of the manager of a Midwest branch office which violated a consent decree. The court found ample evidence that the branch manager had "willfully violated the consent decree while acting within the scope of her authority," noted that "a corporation may be held criminally responsible for antitrust violations committed by its employees or agent acting within the scope of their authority," and found "no reason to establish higher standards of proof" for violations of judicial decrees." *Id.* at 658–60.

## V. *Conclusions of Law*

■ Because of my findings of fact in this case, I conclude as a matter of law that *Business Week* cannot be permitted to use the confidential materials it obtained to publish its story. *Business Week* knowingly violated the protective order and is thus not entitled to any relief.

*Business Week* argues that it is irrelevant how they obtained the confidential information. It contends that once information is acquired by the press, it is a prior restraint in violation of the First Amendment for this court to prohibit immediate publication. However, the Supreme Court, in *Seattle Times v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984), specifically addressed whether parties to civil litigation have a First Amendment right to disseminate, in advance of trial, information gained through the pretrial discovery process. The Court held that where a protective order is entered on a showing of good cause, is limited to the context of pretrial discovery, and does not restrict the dissemination of the information if it is gained from sources other than protected discovery, it does not offend the First Amendment.

In addressing plaintiff's prior restraint argument, the Court first noted that "[f]reedom of speech ... does not comprehend the right to speak on any subject at any time." *Seattle Times*, 467 U.S. at 31, 104 S.Ct. at 2206, quoting *American Communications Assn. v. Douds*, 339 U.S. 382, 394–95, 70

S.Ct. 674, 681–82, 94 L.Ed. 925 (1950). The Court then stated that "an order prohibiting dissemination of discovered information before trial is not the kind of classic prior restraint that requires exacting First Amendment scrutiny," 467 U.S. at 33, 104 S.Ct. at 2208, because "such a protective order prevents a party from disseminating only that information obtained through use of the discovery process." *Id.* at 34, 104 S.Ct. at 2208. Twice in its opinion the Supreme Court stressed the unique character of the discovery process, *Seattle Times*, 467 U.S. at 34 and 36, 104 S.Ct. at 2208 and 2209. In so doing, it emphasized that "[l]iberal discovery is provided for the sole purpose of assisting in the preparation and trial, or settlement, of litigated disputes." 467 U.S. at 34, 104 S.Ct. at 2208.

The Court posited the following test to determine when judicial action to prevent the dissemination of information, which has been obtained pursuant to court-ordered discovery, is constitutional:

> If the judicial practice in question furthers an important or substantial governmental interest unrelated to the suppression of expression and if the limitation of First Amendment freedoms is no greater than is necessary or essential to the protection of the particular governmental interest involved, such judicial action is constitutional.

*Seattle Times*, 467 U.S. at 32, 104 S.Ct. at 2207. It is therefore necessary to consider whether the protective order furthers a substantial governmental interest unrelated to the suppression of expression and whether my order prohibiting *Business Week*'s publication is no greater than is necessary to protect that substantial interest.

I find that the protective order which Judge Rubin had entered in this case served a substantial governmental interest because it facilitated efficient pretrial discovery of sensitive material without extensive court involvement. The protection afforded to the parties to maintain the privacy of this information permitted full inter-party disclosure, a prerequisite in our modern adversarial process.

Moreover, my order prohibiting *Business Week's* publication of the confidential discovery is not a greater limitation than is necessary to protect the substantial government interests in efficient pretrial discovery and the sanctity of court orders. The efficient administration of discovery necessitates that I be able to prevent *Business Week* from publishing what never would have existed independently of the discovery process. If the parties to litigation cannot rely on the protective orders of a court, they will surely resist discovery of sensitive information. The burdensomeness of pretrial discovery is well documented; permitting publication of unlawfully obtained and protected discovery information can only make this situation substantially worse.

In addition, I cannot permit *Business Week* to snub its nose at court orders. *Business Week* was aware of the protective order in this case but nevertheless continued to pursue the sealed information. The integrity of a court and the entire judicial system requires that its orders be acknowledged and obeyed. To make an exception for *Business Week* will render future orders of this court of questionable validity and effect.

Thus, I conclude that *Business Week* may not use the confidential materials that it obtained unlawfully. However, this does not end the matter. In a companion Opinion and Order, entered on this same date and time, I have held and ordered that Procter & Gamble may amend its complaint to include a RICO count. In granting this motion, I have concluded that the memorandum in support of the motion to amend, the proposed amended complaint, the RICO case statement, and Bankers Trust's opposition papers to the motion to amend become a part of the public record. Hence, while I am here holding that *Business Week* cannot publish the information it obtained illegally and in violation of a protective order, this same information has independently become a part of the public record and may be disseminated by anyone so interested.

In the companion Opinion, I ordered that it not become effective until October 3, 1995 at 4:00 p.m. I likewise hold that this Order will not become effective until that same time and date, namely October 3, 1995 at 4:00 p.m.

IT IS SO ORDERED.